2016 IL App (4th) 150703

NO. 4-15-0703

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Greene County |
| GARRY L. HILLIS, | ) | No. 13CF100 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James W. Day, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury found defendant, Garry L. Hillis, guilty of aggravated driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(d)(1)(F) (West 2012)), and the trial court sentenced him to five years' imprisonment. He appeals on two grounds: (1) the court abused its discretion by granting a motion *in limine* by the State and by denying his own motion *in limine*, and (2) it was unproved that he was the driver. We find no abuse of discretion in the rulings on these motions *in limine*, and looking at all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that defendant was the driver. Therefore, we affirm the trial court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3                                    A. The Charge

¶ 4          In the information, the State charged defendant with committing the offense of aggravated DUI (625 ILCS 5/11-501(d)(1)(F) (West 2012)) in that, on May 2, 2013, he drove a Ford F-150 pickup truck on Illinois Highway 108 in Greene County, Illinois, while under the influence of alcohol and was involved in a motor vehicle accident, which proximately caused the death of Brandy Gilbert.

¶ 5                              B. The Motions and Orders *in Limine*

¶ 6          Before the jury trial, the parties filed motions *in limine*. The rulings on two such motions are at issue in this appeal.

¶ 7                    1. *The State's Motion To Bar a Physician,*
                              *Charles Earnshaw, Jr.,*
                        *From Reconstructing the Accident*

¶ 8          In its "Motion *in Limine* No. 2," the State said it anticipated the defense would call a physician, Charles Earnshaw, Jr., as an expert witness. (The State's "Motion *in Limine* No. 1" is not at issue in this appeal.) The State argued that although, judging by his curriculum vitae, Earnshaw "[might] be qualified to testify as to matters that pertain[ed] to [i]nternal [m]edicine," he lacked "the requisite formal education, experience, or scientific expertise to qualify him to testify as to matters discussed in his report as related to accident reconstruction and occupant placement."

¶ 9          According to Earnshaw's curriculum vitae, he has a bachelor's degree in chemistry and a medical degree. He is a retired physician who specialized in internal medicine. Apparently, he never has taken any classes in accident reconstruction (at least none are listed

under the heading of "Education"), and his curriculum vitae nowhere mentions any training or experience in that field.

¶ 10       Nevertheless, in a report he wrote for defense counsel, Earnshaw stated:

"I protracted the angle of the slope from the shoulder of the highway to the base of the pole[,] and this angle is between [12] to 15 degrees downward. Assuming highway speeds and a rain[-]slicked asphalt road[,] the victims' truck probably struck the pole between [40] to [60 miles per hour]. *** The front passenger door received damage that was relatively minor[,] with the major impact occurring to the truck frame behind the front passenger seat and door. A passenger in the rear seat would have experienced the full impact. If [Gilbert] had been the restrained or even unrestrained passenger[,] I doubt that her injuries would have been nearly as severe. If[,] on the other hand[,] she had been the unrestrained driver[,] she would have been hurled at vehicle speed at the roof, door, door frame, and [defendant's] left side with great force. This scenario would best explain the severity and location of her injuries[,] including the bruising of her left anterior thigh from contact with the steering wheel. If [defendant] had been the unrestrained driver[,] he would have suffered severe right[-]sided head and chest injuries but probably less severe than those of [Gilbert]. In addition[,] [Gilbert] would have in all likelihood suffered significant left[-]sided injuries when he struck her. If [defendant] had been a restrained driver[,] his injury would probably be a seatbelt bruise from the left shoulder to his right hip. *** In conclusion[,] I feel that [Gilbert] was the unrestrained driver and [defendant] was the restrained passenger in this accident but do not have enough evidence to be certain."

¶ 11 Because Earnshaw apparently had no education, training, or experience in accident reconstruction, the State requested, in "Motion *in Limine* No. 2," that the trial court bar him from "testifying as an expert in matters regarding the reconstruction of the accident involving the [d]efendant, *** and that before any attempt to elicit testimony of the same from *** Earnshaw ***, the proper foundation *** be demonstrated outside the presence of the jury."

¶ 12 On April 9, 2015, in a pretrial conference, the trial court granted the State's "Motion *in Limine* No. 2." The order reads: "State motion to deny witness granted."


¶ 13          2. *Defendant's Motion To Bar an Accident Reconstructionist,*
*Nathan S. Shigemura, From Opining, on the Basis of Injury Patterns,*
*Who the Driver Was*

¶ 14 The State disclosed an expert, Nathan S. Shigemura, who, according to defendant's motion *in limine*, was "a relatively well-known 'crash reconstruction' expert in the State of Illinois." Defendant admitted that Shigemura was "definitely qualified to opine on how the crash in this case occurred," but he argued that Shigemura was unqualified "to opine on who was driving the vehicle at the time of the crash[,] because he base[d] that opinion on the extent of the injuries to [defendant] and Ms. Gilbert, without having any medical training or education."

¶ 15 Shigemura already had given his opinion that defendant was the driver. He had expressed this opinion in a letter of December 6, 2013, to the Greene County sheriff, Robert D. McMillen. A copy of Shigemura's letter to McMillen is in the record; it is attached to defendant's motion *in limine* as exhibit A.

¶ 16 In Shigemura's letter, under the heading "*Occupant Kinematics*" (referring to the movement of vehicle occupants in a crash), he begins by describing how the accident happened: the pickup truck slid diagonally to the right and into a utility pole, as illustrated in a drawing.

(Emphasis in original.) The impact was in the area of the passenger door, near the side mirror. The front-seat passenger, Shigemura explains to McMillen, would take the brunt of the impact:

"[T]he front[-]seat passenger would move to the right and forward[,] into the collision region[,] and would sustain severe injuries, predominantly to the right side. The driver's injuries would be less severe than the passenger's since the driver would be f[a]rther from the collision region and not moving into the collision region. The passenger would also be [in between] the driver and collision region[,] thus providing shielding and cushioning for the driver. Ms. Gilbert sustained severe injuries[,] including skull fractures[,] as a result of the crash. The magnitude and locations of the injuries sustained by Ms. Gilbert indicate that she was in the immediate area of the impact at the time of the collision. These injuries led to the death of Ms. Gilbert.

[Defendant] sustained minor injuries, described as 'bumps and bruises[,]' in the collision and was treated and released from the hospital the night of the crash. Minor cuts were located on the right arm of [defendant]. While at the hospital[,] [defendant] 'was complaining of his side hurting.' When examined at the Greene County [s]heriff's [o]ffice two days after the crash, [defendant] had soreness and a red mark to the left chest area. The bottom of the steering wheel of the truck was bent forward. The damage to the steering wheel and the soreness/red mark to the left chest area of [defendant] are consistent with [his] striking the steering wheel with his left chest area as [he] moved to the right and forward at the time of the collision with the pole. At the time of the collision, the steering wheel would have been turned to the left in an unsuccessful attempt to

- 5 -

bring the vehicle back onto the roadway (which also caused the counterclockwise rotation of the vehicle). Because the steering wheel would have been turned to the left, the bottom of the steering wheel would have rotated up to the 'three o'clock' position[,] where it was struck by [defendant].

Thus, evaluation of the information available, inspections of the scene and [the] Ford truck[,] and analyses of the vehicle motion and occupant motion[,] with related injury pattern, all indicate that [defendant] was the driver and Ms. Gilbert was the passenger of the Ford truck at the time of the crash."

¶ 17    Defendant argued in his motion *in limine*: "[I]t is clear that Mr. Shigemura's opinion that the [d]efendant was the driver is *primarily* based upon the injury pattern he observed in the medical records in this case. *** And since Mr. Shigemura has NO general or specialized medical training or experience, he cannot, as a matter of law, depend on the medical records to reach his conclusion." (Emphasis in original.) Therefore, defendant requested the trial court to "enter an [o]rder limiting the State's expert witness opinion to that evidence related to accident reconstruction and not the medical records in this case."

¶ 18    In the pretrial conference of April 9, 2015, the trial court "[d]en[ied] [defendant's] mot[ion] to eliminate Shig[e]mura as a witness," to quote the order.


¶ 19                          C. Evidence in the Jury Trial

¶ 20                          1. *The Testimony of Michael Lovel*

¶ 21    Michael Lovel was a Carrollton police officer. The evening of May 2, 2013, he was on his regular patrol. At approximately 11:15 p.m., a dispatcher radioed him that the Greene

County sheriff's office had requested the assistance of the Carrollton police with an accident west of Carrollton, on Illinois Highway 108. Lovel drove to the scene of the accident.

¶ 22    It had been raining off and on throughout the evening. It was a little muddy out, a little slick. At the first set of "S" curves, Lovel saw a broken utility pole and drooping power lines. After parking his squad car in a position that would warn eastbound drivers of the downed power lines, he got out and began descending the embankment, toward a pickup truck, which had come to rest in a field below.

¶ 23    He encountered defendant on the way down the embankment. Defendant "was visually upset, frantically running about[,] and he *** came up the embankment screaming that 'She needs help[!] She needs help[!] We need to get her to the hospital[!]' " The truck was pointing away from Lovel, toward the south, and at first he did not see to whom defendant was referring. Then defendant led him around the truck, to a woman lying on the ground, on her left side, 10 to 15 feet from the driver's side of the truck. Defendant told him it was Brandy Gilbert—and, in fact, Lovel was acquainted with both her and defendant, having (in a professional capacity) interacted with them on previous occasions. The right side of Gilbert's face was red and swollen, and she appeared to be bleeding from the right rear of her head. Her hair was blood-soaked. Defendant lifted her arm, and it fell down limply when he released it.

¶ 24    Lovell called emergency medical services and the fire department. As he waited for them to arrive, the wind picked up, and it began to rain, so he got a blanket out of his squad car and covered Gilbert with it to keep her warm. Soon the paramedics arrived. Deputy Sheriff Chris Weller also arrived. Lovel helped the paramedics carry Gilbert up the embankment and into an ambulance. Defendant also was taken away in an ambulance, or so Lovel assumed (he was concentrating on Gilbert).

¶ 25    He never asked defendant what had happened or who had been the driver.

¶ 26                    2. *The Testimony of Chris Weller*

¶ 27    On May 2, 2013, the dispatcher notified Weller of a single-vehicle crash that had occurred about four miles west of Carrollton, "on the first set of 'S' curves." Weller was 20 to 30 minutes away. Upon arriving, he saw fire trucks; ambulances; another police officer; a snapped utility pole; power lines close to the ground; and "a black truck pointed south on the south side of the road[,] in the field." Two people were being loaded into ambulances. The ambulances left.

¶ 28    Weller walked down the embankment. He testified: "It was rainy. It was cool. It was slippery. *** [The truck] had been hit on the passenger side, like on the passenger side corner post." Gilbert was the registered owner of the truck, or so Weller "believe[d]." (Actually, it was undisputed that defendant was the registered owner of the truck. A 2013 Illinois registration card found in the truck named him as the owner, and later in the trial, he testified he was the registered owner.)

¶ 29    When a state trooper arrived at the scene, Weller went to Boyd Hospital to find out the condition of the two occupants of the pickup truck. Gilbert was unconscious and in critical condition, and she was going to be flown out. She had a "trauma or wound *** on the right side of her head" and "lacerations *** on her right shoulder." Defendant, however, was in a condition to talk. When the state trooper, named Goodman, came to the hospital, he or Weller read defendant his rights and asked him what had happened. Defendant explained what had happened, including who the driver was. (When defense counsel, on cross-examination, asked Weller what defendant's answer was to the question of who had been the driver, the prosecutor objected on the ground of hearsay, and the trial court sustained the objection.)

¶ 30 Subsequently, Weller attended two further interviews of defendant. Defendant was consistent in what he said in all the interviews. During one of the interviews, defendant lifted up his shirt and showed "he had a mark on his chest." Defense counsel asked Weller:

"Q. Did you, while you were standing there, being videotaped, make a mark—make a hand signal across from his right shoulder to his lower hip and say, 'Yeah, passenger seat restraint.'?

A. I don't recall.

Q. Is it possible?

A. I don't recall. That state—

Q. If it were videotaped, it would show, would it not?

A. Yeah, it would, but I don't recall.

Q. Okay.

A. That's been a long time ago. I don't recall what I did."

¶ 31 A couple of days after the accident, Weller also interviewed "a Ms. Stewart at Moto Mart in Carrollton." He asked her if she saw Gilbert the day of the accident. Stewart replied that she had. According to Stewart, Gilbert stopped by the Moto Mart in the afternoon, to get some cash with her debit card, but "[t]he debit machine was broke[n]," and she could not get any cash. At the time, Gilbert "was driving the vehicle," and nobody was with her. Gilbert "always drove the vehicle to work," Stewart told Weller.

¶ 32 3. *The Testimony of Brandi Field*

¶ 33 Brandi Field is a master trooper with the Illinois State Police. More specifically, she is a crime scene investigator. A search warrant authorized her to search the persons of

defendant and Gilbert; collect deoxyribonucleic acid (DNA), fingerprints, and handprints from them; and search the pickup truck.

¶ 34    On May 4, 2013, she went to the Greene County sheriff's office to meet with the sheriff, to photograph defendant, and to take standards from him. Pursuant to the search warrant, she took cheek swabs and a hair sample from him, and she obtained his fingerprints and palm prints. She also took photographs of him. As shown by the photograph labeled People's exhibit A-5, his "left side [was], just under the nipple line[,] *** just a hair redder." She saw nothing out of the ordinary on his chest, shoulders, and back. On the back of his hands and on his forearms were some small nicks or abrasions, evidently from the tiny cubes of broken glass that had flown through the cab of the truck when the passenger window exploded. Between the eyebrow and eyelid of his right eye, he had a small abrasion like a pinprick and some reddish discoloration.

¶ 35    Next, Field "went to where the vehicle was secured," Pyatt Towing Company. She described the exterior of the truck as follows:

> "A. It was a black pickup truck with a gray interior. The significant damage on the passenger side—looked like something underneath—undercarriage and looked like it had been rolled[,] but the whole passenger side was just laid open like a can opener. It was, um, the window was broken on the passenger side, on that side. The other windows were intact. It looked like that damage had been focused on that passenger side."

¶ 36    She described the interior of the truck as follows:

> "A. There was food, like carry-out food, strewn all in the passenger floorboard. There was a cell phone in the floorboard of the passenger side, front. There [were] items, personal items, in the back seat. *** [I]t was like a half-cab

so there was a bunch of stuff stacked back there. But besides a lot of red, blood-like substance, there was glass throughout the vehicle from the—it looked like from the front passenger door and from that little side window behind the passenger door that was broke[n] out."

¶ 37    Field's photographs are in the record. It appears, from these photographs, that the passenger-side mirror is broken off. The passenger door—which, Field testified, would not open—is dented, wavy, and scraped, starting from where the mirror used to be and going back. From front to rear, the damage on the passenger side becomes progressively worse. The extended-cab area, behind the passenger door, is more deeply bashed in, and the bed of the truck on the passenger side has its skin peeled back. The leaf springs are knocked loose from the passenger rear wheel.

¶ 38    It also appears, from these photographs, that the driver's seat, the center console (which is in the down position), the middle seatbelt, and the passenger's seat are stained with splotches of a red, blood-like substance. These red splotches appear to begin on the left half of the passenger seat and to become bigger and more extensive in the area of the middle console and on the driver's seat. A red, blood-like substance appears to be thinly smeared and printed all over the plastic end-part of the middle console, where a cup would be inserted, and kernels of glass are down inside the cup receptacle. On the passenger floorboard, near the passenger door, is a white Styrofoam container, which is split and muddy but appears to have no red stains on it. Also on the passenger floorboard are some hamburger buns, which do not appear to be squashed or bloodied. On the floor hump between the driver floorboard and the passenger floorboard are two slices of white bread, a hamburger bun, and French fries, none of which appear to be

squashed or bloodied. Strips of what appears to be grilled steak are also scattered among these items, on the hump and the passenger floorboard.

¶ 39 People's exhibit B-45 is a photograph of a 2013 Illinois registration card showing defendant as the owner of this truck, a 1986 Ford pickup truck. People's exhibit B-46 is a photograph of his proof of insurance for the truck (the expiration date is September 22, 2012).

¶ 40 After looking at the truck; taking photographs; swabbing the red, blood-like stains; and collecting long strands of hair, some of which was stuck to the driver's-side windshield, Field went to the hospital to look at Gilbert and collect samples from her. By the time Field arrived at the hospital, Gilbert was brain-dead and was being prepared for organ harvesting.

¶ 41 Field found a wooden fragment in Gilbert's blood-matted hair and saw what appeared to be little slivers of wood on her forehead. The injuries on her right side were quite severe: she had "significant scratches and abrasions on the right shoulder," and on the right side of her head, lacerations were stapled together. "[T]hroughout the back of her neck and in front and kind of on her chest," she "had quite a bit of those little lacerations and stuff that you very commonly see with broken glass, the cube glass that comes from *** those side windows during crashes." Her right ear was filled with blood and fluids. There were no visible injuries on the left side of her head. There was a bruise, however, on her left thigh.

¶ 42 Field took photographs of Gilbert lying on a bed in the hospital. It appears, from these photographs, that the shoulder wound consists of three, four, or five closely spaced lacerations roughly parallel to one another, covered and held shut with a strip of transparent medical tape. These lacerations are on top of the shoulder (that is, on the horizontal plane of the shoulder), starting near the tip of the shoulder and extending toward the neck. The right side of

her face and neck and her right shoulder near the base of her neck have many little nicks, or dicing lacerations. She also appears to have these dicing lacerations on her upper right forehead, where they are especially plentiful.

¶ 43        One photograph shows Field spreading the hair on the right side of Gilbert's head to reveal a Y-shaped fragment of wood sitting on top of blood. Also on the right side of her head, about a couple of inches above her ear and a little to the front, just inside the hairline, is a laceration stapled shut with four staples. Slightly to the left of that laceration is another laceration, stapled shut with a single staple. A photograph shows blood pooled in her right ear canal, and the ear looks raw and bruised above the canal. No injuries are visible in a photograph of the left side of her face.

¶ 44        A report by a forensic scientist, Aaron Small, revealed that the blood samples Field had collected from the floor between the driver's seat and door, the driver's side dash, the driver's seat, the middle console, and the passenger seat all tested as a DNA match for Gilbert.

¶ 45        On cross-examination, Field testified she noticed no abnormality in the steering wheel; to her, it did not look bent. Although she had removed the cover from the steering wheel to have the red, blood-like substance on the cover analyzed, it never was analyzed. There was mud on the truck pedals but no actual footprint. Although the middle seatbelt, which Field had cut loose and collected, was stained with a red, blood-like substance, there appeared to be nothing significant on either of the other two seatbelts (*i.e.*, the driver's seatbelt and the right passenger's seatbelt).

¶ 46                    4. *The Testimony of Rob McMillen*

¶ 47      Rob McMillen, the Greene County sheriff, interviewed defendant on May 4, 2013, at the sheriff's office and asked him to show any injuries or physical complaints. Defendant lifted up his shirt, and McMillen photographed "some discoloration" "underneath the left nipple area."

¶ 48      Defense counsel asked McMillen:

"Q. Did you—[d]uring the interview, before that, or after the picture was taken, did you and Deputy Weller—Weller trace the nature of the injury across his chest, from left shoulder to right—right shoulder to left?

A. I believe so.

Q. And make a comment that could be a passenger seat restraint?

A. I don't recall that."

¶ 49      In the interview at the sheriff's office, defendant denied he was the driver. Weller reported that when he interviewed defendant earlier, in the hospital, defendant likewise denied he was the driver. (The prosecutor elicited that testimony.)

¶ 50      Because the injuries to the right side of Gilbert's body were so severe, however, and because defendant's injuries were, by contrast, mild, and because the impact had been on the right side of the pickup truck, which seemingly corresponded with Gilbert's right-sided injuries, McMillen was skeptical that Gilbert had been the driver. Therefore, he telephoned crime scene services at the Illinois State Police and requested help in determining occupant placement. As it turned out, occupant placement was beyond the expertise of crime scene services, but a crime scene investigator named LeMasters recommended a private contractor, Shigemura, as an accident reconstructionist who was qualified to determine occupant placement. So, McMillen

telephoned Shigemura, and the county hired him. At Shigemura's request, McMillen sent him "all evidence reports, anything [they] had so he [could] review it."

¶ 51                    5. *The Testimony of Nathan S. Shigemura*

¶ 52         In 1989, Shigemura began working as an accident reconstructionist for the Illinois State Police. To become a certified reconstructionist for the state government, he had to complete four courses totaling 200 hours, and he had to pass an examination.

¶ 53         Not only was he certified by the State of Illinois, but he also was accredited by an international organization, the Accreditation Commission for Traffic Crash Reconstructionists. He likewise had to pass an examination to obtain that accreditation.

¶ 54         Ever since his retirement from the Illinois State Police in 2002, Shigemura had been working full-time as a private consultant in accident reconstruction. He had taught many classes and had cowritten textbooks on the subject. He had reconstructed "hundreds and hundreds" of crashes. He had testified as an expert in Montgomery, Macoupin, Greene, Jersey, Sangamon, Menard, St. Clair, and Madison Counties, as well as in a couple of counties outside Illinois.

¶ 55         In the fall of 2013, Greene County hired him to reconstruct the accident that had occurred on Illinois Highway 108 and to determine the seating positions of the two occupants of the truck, defendant and Gilbert, at the time of the accident. He reviewed the documentation, including the medical records and the police reports. He looked at the pickup truck. He visited the scene of the crash.

¶ 56         In his testimony, he described the scene of the crash and how the accident had happened:

"A. Well, the location, basically, was—it's an east-west road, two-lanes, [s]tate [r]oute, and the road, for an eastbound vehicle, the road curves to the left. Once you enter the curve to the left, you go a little ways[,] and then the road curves back to the right and heads by east again [*sic*]. In the initial curve for an eastbound vehicle that curves to the left, the vehicle, in this particular crash, failed to negotiate the curve fully and left the roadway to its right, went down an embankment, went down in a grassy area for—a fair distance and struck a power pole with the passenger side of the vehicle. The impact caused the power pole to snap[,] and the vehicle rotated and came to rest several feet past the power pole."

It was near the passenger-side mirror that the truck first made contact with utility pole, Shigemura said. The truck then raked the pole along the passenger door until the pole snagged on the rear door of the extended cab, causing the truck to rotate. The occupants and anything else inside the cab of the truck would have been hurled toward the pole.

¶ 57         The passenger would have received more force than the driver, Shigemura explained, because the passenger was closer to the impact. Similarly, the driver of a bus hit head-on, in the front, would feel more of an impact than people sitting in the rear of the bus. Shigemura inferred that the passenger in the pickup truck was unrestrained, because the webbing of the passenger seatbelt did not have any blood on it and because glass cubes were down inside the seatbelt buckle. "[I]f it was buckled, the glass pieces wouldn't get down that far."

¶ 58         Shigemura continued (referring to a diagram):

"The person sitting right here[,] [in the passenger seat,] sustained a lot of injury, especially if that person was not wearing their seatbelt. And many times, for example, in [a] 90-degree collision like this, even if you are wearing your seatbelt,

- 16 -

many times it's not going to go well for you because the impact zone is right where you're sitting. *** This person, the driver, will sustain less injury, especially in the direction the driver is moving[,] because the driver is f[a]rther away from the collision, f[a]rther away from the impact zone. The f[a]rther away you are, the force, you feel less of the force. *** Now[,] I don't say it's minimal[;] I'm just saying it gets less as you move away from the collision force.

[Gilbert] sustained significantly more severe injuries than [defendant] did. She had cuts and dicing—dicing [is] little-bitty cuts on your skin, because as the glass shatters, safety glass shatters into small, circular kind[s] of pieces, and as it shatters, when it shatters, it blows out. I mean it just explodes[,] and flying glass will cut you[,] and we get those characteristic cut patterns that we call 'dicing' on the side of her face. You also see the—the severe injury and trauma to the head. In some of the photographs, you saw a wood, a piece of wood in the scalp, presumably from the pole itself because the pole is now intruding into the side of the vehicle, the window is now shattered out[,] and she engages with the pole also because the door panel is—is intruding into the passenger compartment and the window is no longer there[,] so there's no barrier between her and the pole now."

¶ 59 The driver, Shigemura testified, would have been thrown toward the rear-view mirror and perhaps would have clipped the steering wheel. And, indeed, according to Shigemura, there was evidence that just this had happened, in that "[t]he bottom arc of the steering wheel was bent forward" and defendant had a bruise on his left side, where, apparently, he had caught the steering wheel with his body. Although Field testified the steering wheel had sustained no

damage, Shigemura disagreed: he, too, had photographed the steering wheel, and even in the photographs that Field had taken, he could see it was bent.

¶ 60         The prosecutor asked Shigemura:

"Q. So, based on your review of everything that you were provided by the [s]heriff and your independent investigation of the scene and of the science that you perform to do that, were you able to develop an opinion[,] with a relative [*sic*] degree of scientific certainty[,] as to where the occupants were in the vehicle at the time of the crash?

A. Yes.

Q. And what was the opinion?

A. I believe the female was the passenger at the time of the crash and the male was the driver at the time of the crash."

¶ 61         On cross-examination, defense counsel asked Shigemura the number of previous felony cases in which he had been hired to determine which occupant of a vehicle was the driver. Shigemura answered: "I don't remember that particular topic being the specific focus of any felony investigation." He added, however, that although this was his "[f]irst trial case" in which he had *testified* on occupant placement, it was not the first case in which he had *determined* occupant placement ("just because I haven't had a trial doesn't mean I haven't done this before, many times").

¶ 62         Shigemura admitted, on cross-examination, that the greatest impact was when the utility pole snagged on the structural post behind the passenger seat. Nevertheless, he insisted: "That doesn't mean that [the sideswiping is] inconsequential. You [sideswipe] something, you could get very good forces and very good intrusion[,] as we saw by looking at this particular

vehicle." It had to be borne in mind that the sheet metal of the passenger door was flexible. Because sheet metal to some extent "pop[ped] back out" after it was hit, the collision in that area "look[ed] more superficial"—but "[it was] not." Although a greater impact was on the way, the initial impact should not be discounted. The grass was wet, the treads on the rear tires of the truck were not very good, and as the driver struggled to get back onto the road, the truck rotated counterclockwise, "present[ing] that passenger side to the pole," and "bam, hits it, shags, snap, rotates, down." "[T]he initial contact was penetrating enough and broke out the window enough to allow the person sitting there to strike what's right outside the window. You have the horizontal striations on her shoulder that look like brushing up against a pole as in the—as where the head strikes are occurring."

¶ 63        Defendant, as the driver, could not have sustained the injury to his left side by striking Gilbert, as the passenger, because the two of them would have moved parallel, in the same direction, until they struck something. Also, if defendant had been sitting in the passenger seat, he would have been "covered with cuts," as Gilbert was, because the buckling of the passenger door exploded the window of that door.

¶ 64                                  6. *The Stipulation*

¶ 65        The parties stipulated that (1) on May 2, 2013, a black Ford F-150 extended-cab pickup truck was involved in an accident; (2) at the time of the accident, defendant had a blood alcohol level above 0.08 per 100 milliliters of whole blood; and (3) the accident resulted in, and was the proximate cause of, Gilbert's death.

¶ 66                            7. *The Testimony of Suzanne Holmes*

¶ 67    The State rested, and the trial court denied defendant's motion for a directed verdict. The defense then called Suzanne Holmes as its first witness.

¶ 68    Holmes testified that, during the evening of May 2, 2013, she was working as a cook at Thirsty's Tavern in Eldred, Illinois, and that defendant came in with his fiancée, Gilbert. The two of them were frequent patrons of the tavern, and in fact, Gilbert herself worked there part-time. "They were celebrating [defendant's] birthday, havin[g] a good time, cuttin[g] up." They were outside a lot with Holmes, in the kitchen (the kitchen was in a wire enclosure outside the tavern).

¶ 69    When Gilbert and defendant were ready to leave, they ordered take-out food, as they usually did. Holmes cooked the food and brought it into the tavern. Gilbert paid for the food and, keys in hand, said: " 'I'm going to take his drunken ass home.' " Defendant was already outside at that time—smoking, Holmes presumed. She did not see him and Gilbert get into the truck; nor did she see them leave. Instead, she and her friends ran next door, through the pouring rain, to the American Legion.

¶ 70    Four or five days after the accident, defendant came to Thirsty's Tavern and showed Holmes the bruises he had sustained in the accident.

¶ 71                    8. *The Testimony of Garry Hillis, Sr.*

¶ 72    Defendant's father, Garry Hillis, Sr., testified that, about three days after the accident, defendant "was complaining about his ribs." He had a "yellowish bruise mark *** underneath his breast."

¶ 73                    9. *The Testimony of Lela Groves*

- 20 -

¶ 74     The day after the accident, defendant's aunt, Lela Groves, saw bruising on defendant's body. She did not see his chest, but she saw a red mark on the right side and extending down toward the hip.

¶ 75                    10. *The Testimony of Ryan Baker*

¶ 76     Ryan Baker, who described himself as defendant's "very good friend," testified he saw "seatbelt marks" on defendant and that these marks became progressively more visible in the days after the accident. He testified:

    "A. They kept getting deeper and deeper, you know, like a bruise does, you know. They start out kind of light. Then, you know, they just start settin[g] in. They start turnin[g] yellow and dark purple and stuff.

    Q. Sort of the rainbow?

    A. Yeah, sort of like a rainbow.

    Q. All right. So you say that you saw at [*sic*] him at least three or four times?

    A. Yeah."

¶ 77                    11. *The Testimony of James Hall*

¶ 78     James Hall is a traffic accident reconstructionist and the proprietor of J.W. Hall and Associates, a business that does "forensic collision analysis." To become an accident reconstructionist, he took classes at various colleges. He began working as a reconstructionist for the Illinois State Police in 1981, simultaneously starting his own private practice. He had investigated around 600 accidents for the Illinois State Police. Since his retirement from there in

1997, he had continued as an independent contractor, averaging about 50 cases a year. He also had taught college courses in accident reconstruction. He had never testified in a felony case before, but he had testified in civil cases.

¶ 79        The defense had hired him to determine which of the two occupants, defendant or Gilbert, was driving the pickup truck at the time of the accident. To make that determination, Hall inspected the truck, which was at a salvage yard; he went to the scene of the accident; and he looked through the photographs, the police reports, and "the hospital reports."

¶ 80        Illinois Highway 108, Hall testified, "was straight until there was a curve to the left." At the beginning of the curve, the truck went off to the right and toward the utility pole. The truck sideswiped the utility pole on the right side, about a fourth of the way behind the front edge of the passenger door, and then, keeping contact with the utility pole, the truck rotated counterclockwise to a support pillar behind the passenger seat (the B pillar), where the maximum, heavy impact and the deepest penetration occurred.

¶ 81        With the initial impact, the occupants would have moved only "slightly" to the right, Hall explained ("some movement to the right but not [so] fantastic a movement"), because it was, as of yet, only an oblique, sideswiping impact. The next impact, the impact of the B pillar with the utility pole, was the major one and would have caused the most damage to the occupants. They would have moved violently in the direction of that impact, toward the B pillar, toward the right rear of the cab. Hall was unable to say whether the passenger had a seatbelt on, but in any event, the passenger would have gone backward, into the padding of the passenger seat, where the B pillar was.

¶ 82        The driver, if unrestrained, would have come out worse, Hall testified, because the driver would have had "more running speed" than the passenger. The driver would have

flown to the right, striking the middle console—which evidently was in the down position at the time of the crash, judging by the blood on its surface and the lack of blood inside the console—and would have struck the left side of the passenger, who, by contrast, would have had "only *** a slight movement to the right," since he "already [was] there." Thus, Hall would expect the passenger to have injuries on both the left side and the right side of the body: on the right side from contact with the right rear of the cab and on the left side from being struck by the unrestrained driver. (Hall assumed, from defendant's account, that Gilbert was unrestrained, because defendant stated he woke up in the passenger seat and saw her lying at his feet, on the passenger floorboard.) But the injuries to the unrestrained driver would be greater, in Hall's opinion.

¶ 83        On cross-examination, the prosecutor asked Hall why Gilbert, compared with defendant, had so many dicing injuries from the flying glass if, as Hall theorized, she was farther away from the exploding passenger window. Hall answered that because defendant, as the passenger, was pushed to the rear and to the right, most of the flying glass from the passenger window bypassed him.

¶ 84        Having reviewed the medical reports, Hall was aware of the severe, fatal injuries to the right side of Gilbert's body, and in his report, he "acknowledged the importance of injury patterns in determining *** who the driver was." But he disagreed with Shigemura that the injury patterns enabled one to say, to "a reasonable degree of accident[-]reconstruction certainty," that Gilbert was the passenger. In Hall's view, it was impossible for any accident reconstructionist to opine, to a reasonable degree of accident-reconstruction certainty, who the driver was in this case—but he thought that Gilbert was the driver.

¶ 85    He blamed the uncertainty partly on the police. By his understanding, out of all the blood samples taken from the cab of the truck, the only blood tested was the smear of blood on the dash, by the vehicle identification number—and it was Gilbert's blood. Hall admitted, though, that if defendant had dragged Gilbert from the passenger seat, he could have gotten her blood on his hands and smeared it on the dash.

¶ 86                          12. *Defendant's Testimony*

¶ 87    Defendant testified that Gilbert had been his fiancée and that they had lived together for three years.

¶ 88    On May 2, 2013, he got off work at 5:30 or 5:45 p.m. Gilbert took her children to her mother's house because she and defendant intended to go to Thirsty's Tavern and celebrate his birthday—and, besides, they always went to Thirsty's Tavern on Thursday nights, for the raffle drawing. They tarried a while at home, drinking beer, and then, around 6:15 or 6:30 p.m., they left Carrollton for Thirsty's Tavern, in Eldred.

¶ 89    They went in the Ford F-150 pickup truck (the truck which, later that evening, would strike the utility pole). Gilbert, exclusively, was the driver of the truck that entire evening, and defendant was the passenger. Although the title was still in his name, she had been driving the F-150 for six to eight months preceding the accident, and he had been driving a different truck, a "[1997] Z71 extended[-]cab truck." She drove the F-150 to work every day. "It was her truck." During those six to eight months, he drove the F-150 only "[o]ccasionally" and "not much at all." He did not drive it on May 2, 2013, and as of that date, it had been probably a month since he last drove it.

¶ 90       Before leaving Carrollton in the early evening of May 2, 2013, they pulled into Moto Mart, and Gilbert parked the truck and went in to get cash and cigarettes while defendant waited in the passenger seat. Then Gilbert drove them to Thirsty's Tavern.

¶ 91       They were at the tavern from approximately 6:30 to 10:30 p.m. Defendant "probably had 12 beers" and "4 or 5 shots." That was, he admitted, "a lot of booze," and he did become "intoxicated." He was sure he had more to drink that night than Gilbert.

¶ 92       When he and Gilbert were ready to go, they ordered take-out food from the beer-garden grill, as was their custom. Holmes, the cook, brought in their food, and Gilbert paid for it. Defendant went outside and smoked a cigarette, waiting on Gilbert. Holmes and Gilbert came outside and talked for a while. He told Gilbert, " 'I'm goin[g] and getting[g] in the truck. *** Come on.' " It was "pouring down rain," and he climbed into the passenger seat of the F-150. Two to five minutes later, Gilbert climbed into the driver's seat, and they left Thirsty's Tavern.

¶ 93       She drove east, took the Hillview blacktop, and then exited to Illinois Highway 108. Defendant testified:

> "[A]fter Cole Hill[,] I fell asleep. I don't remember nothing after that.
>
> Q. What's the next thing you remember?
>
> A. Waking up.
>
> Q. And describe to the jury what you observed and what—what happened.
>
> A. Whenever I came to, we was—we was in a field[,] I could tell[,] and Brandy was slumped over in the floorboard. And I shook her two or three times, said, 'Brandy, Brandy.' She didn't respond, didn't respond at all."

¶ 94       Gilbert was facedown on the passenger floorboard, defendant testified, and his legs were pinned against the seat. He took his seatbelt off and tried to open the passenger door,

pushing it with his arm, but it would not open. So, he climbed out through the driver's door, grabbed Gilbert by the hips and the pants, and, gripping the steering wheel with his other hand and slipping and sliding and falling down in the mud, he managed to pull her over the floorboards and out of the cab. "She wasn't responsive at all[,] but she was gurgling on blood." He found his cell phone in the truck and brought the phone outside, but it was raining, and he was having difficulty with water on the screen, so he went back into the truck and made a call.

Defense counsel asked:

"Q. All right. Do you remember who you called?

A. My mother was the first person I called because I didn't know how to get ahold of the police station and I know we're not set up for 9-1-1.

Q. Did you have any luck contacting your mother?

A. No, I did not have no luck contacting my mother at all[,] so my next step was, I know that we don't have 9-1-1, but I thought if I call 9-1-1, surely it would get to them and they can figure out where we're at.

Q. Did you actually make contact with 9-1-1?

A. Yes, I did.

Q. And did you have a conversation with anybody?

A. Yes, I did.

Q. Basically, what did they say?

A. They said that—asked me where I was. I said, 'I'm not for sure. We're along [Illinois Highway] 108.' I said, 'We're along [Illinois Highway] 108 for sure.' I said, 'I know that we were headin[g] back eastbound when we left.' And

they said that there was downed power lines so that's probably where [it] was at, is what the lady told me."

Because of the downed power lines, the 911 dispatcher advised defendant to remain in the vehicle and assured him that help was on the way.

¶ 95        Soon after defendant called 911, Lovel arrived. Defendant testified:

"A. I—I ran to him. I said, 'I need help.' I said, 'She's in bad shape.' I said, 'You gotta help me.' And he said to just calm down. He said, 'Stay where you are. There's downed power lines,' he said. He said, 'So just stay there.' He said, 'I'll be there in a minute.' So he got over to me[,] and he bent down[,] and he said, 'She's breathin[g], Garry, She's breathin[g]. Just calm down,' he said."

¶ 96        On cross-examination, defendant testified he always wore his seatbelt and that he did not remember whether Gilbert wore her seatbelt on this occasion. "[A] lot of times she didn't wear her seatbelt," he testified. The prosecutor asked him:

"Q. You never, if you always wear your seatbelt, you never harped on her, I mean she's the—your fiancé[e]. She's raising these two kids that you care about. You never asked her to, 'Hey, please wear your seatbelt?'

A. That's your choice if you want to wear your seatbelt, I feel."

¶ 97        When further questioned by the prosecutor, defendant denied pulling Gilbert out over the seats; he insisted he pulled her out over the passenger floorboard and the driver floorboard.

¶ 98        Also, during its cross-examination of defendant, the State presented evidence that he attempted to call his mother not once, but twice, before calling 911: his first call to her lasting 102 seconds and his second call to her lasting 80 seconds.

¶ 99        On this evidence, the jury convicted defendant. The trial court later sentenced him as stated.

¶ 100                              II. ANALYSIS

¶ 101              A. Barring Earnshaw From Performing Accident Reconstruction

¶ 102                      1. *The Scope of the Trial Court's Ruling*

¶ 103        Defendant says in his reply brief: "It is important to note tha[t] not only was specific testimony of [d]efendant's medical expert pertaining to accident reconstruction excluded, but that the medical expert was prevented entirely from testifying regarding matters that are indisputably within his competency, such as injury analysis."

¶ 104        The trial court's order of April 9, 2015, says: "State motion to deny witness granted"—but what did the court mean by "deny witness"? When interpreting an order of the trial court, we interpret it "in a reasonable manner," of course, "so as to give effect to the apparent intention of the trial court." *Kiefer v. Rust-Oleum Corp.*, 394 Ill. App. 3d 485, 494 (2009). That means interpreting the order "from the entire context in which [it was] entered, with reference to other parts of the record[,] including the pleadings, motions[,] and issues before the court and the arguments of counsel." *Id.* The context of the ruling "State motion to deny witness granted" was the State's "Motion *in Limine* No 2." In that motion, the State requested the court not to bar Earnshaw from testifying at all but, more narrowly, to bar him from "testifying as an expert in matters regarding the reconstruction of the accident." Therefore, it is unclear that "deny witness" meant denying Earnshaw the right to testify at all regarding the injuries Gilbert and defendant had suffered in the accident. It could be argued that, in context, "deny witness" meant denying Earnshaw the opportunity to reconstruct the accident for the jury.

¶ 105    In his opening oral argument, defendant's appellate counsel remarked that, in hindsight, his job would have been easier if trial counsel had requested the trial court to clarify its ruling regarding Earnshaw. Recently, in *People v. Daniels*, 2016 IL App (4th) 140131, ¶ 72, we held that insomuch as the trial court's ruling on the defendant's motion *in limine* was ambiguous, the defendant, the appellant, should have sought clarification from the trial court so that, on appeal, the record would be clear and guesswork would be unnecessary. We realize that, in April 2015, when the trial court ruled on the motions *in limine* in the present case, *Daniels* did not yet exist, but this holding in *Daniels* proceeds ineluctably from two related principles that have been around for a long time.

¶ 106    The first principle is the presumption of regularity. "[A] presumption of regularity *** attaches to the proceeding in the trial court," and the appellant has the burden of rebutting that presumption by showing, from the record, that an error did indeed occur. *People v. Schomer*, 64 Ill. App. 3d 440, 445-46 (1978). If it is unclear from the record that an error occurred—if, for example, the order that the appellant challenges could reasonably be interpreted in either of two ways, one of which would yield a correct ruling and the other an erroneous ruling—the presumption of regularity is unrebutted.

¶ 107    The second, related principle is that the would-be appellant must make an adequate record while in the trial court. A party who would appeal must ensure the record is clear and ample enough to substantiate the claims of error he or she intends to raise in the appeal. *People v. Carter*, 2015 IL 117709, ¶ 19; *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Say, for example, that a party appeals an order of the trial court but because the order contains ambiguous language that the party never requested the trial court to clarify, we cannot tell if the order really

is erroneous: that party, as the appellant, has failed to make a record adequate to support his or her contention of error, and the ambiguity will be resolved against the appellant.

¶ 108     The cryptic language "deny witness," taken in context, fails to convince us that the trial court's ruling regarding Earnshaw extended beyond accident reconstruction. We are unconvinced that the court barred him from testifying to the injuries defendant and Gilbert had suffered—matters that would have been, as defendant says, "indisputably within his competency." In short, the presumption of regularity is unrebutted in this respect, and we resolve the ambiguity against defendant as the appellant. See *Schomer*, 64 Ill. App. 3d at 445-46.

¶ 109          2. *Earnshaw Has Medical Experience But, Apparently,*
                   *No Experience in Traffic-Accident Reconstruction*

¶ 110     Because Earnshaw practiced medicine in hospitals and in private practice, from 1974 to 2007, defendant disagrees with the State that Earnshaw lacks " 'training or job experience in any area that is related to accident reconstruction.' " Defendant argues the trial court should have denied the State's "Motion *in Limine* No. 2."

¶ 111     We scrutinize this ruling through the lens of a deferential standard of review, the most deferential standard of review recognized by the law (*People v. Hancock*, 2014 IL App (4th) 131069, ¶ 121). We will defer to the ruling on a motion *in limine* unless we find the ruling to be an abuse of discretion. *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000). Even if we disagreed with the trial court's ruling, our mere disagreement would not be enough to make the ruling an abuse of discretion. *Hancock*, 2014 IL App (4th) 131069, ¶ 121. Rather, the ruling is an abuse of discretion only if the court "acted arbitrarily, exceeded the bounds of reason, or ignored or misapprehended the law." (Internal quotation marks omitted.) *Id.*

¶ 112     Given that definition of an "abuse of discretion," we disagree the trial court abused its discretion by deciding that the ability to determine the placement of people within a motor vehicle at the time of a crash did not follow from the ability to diagnose and treat injuries. The court was not required to find that just because Earnshaw was qualified to diagnose and treat, say, a skull fracture sustained in a traffic accident, he was qualified to infer where the patient was sitting in the vehicle at the time of the accident. A doctor in internal medicine is not, *ipso facto*, a traffic-accident reconstructionist.

¶ 113     We agree with defendant that taking classes in accident reconstruction is not necessarily the only way someone could acquire expertise in accident reconstruction. It is theoretically possible that on-the-job "experience" also could impart such expertise. Ill. R. Evid. 702 (eff. Jan 1, 2011); *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 816 (2008). The record appears to contain no evidence, however, that Earnshaw's on-the-job experience as a physician specializing in internal medicine equipped him to opine who the driver was in this accident. He never claimed, for example: "I have found, from taking the medical histories of numerous victims of sideswiping passenger-side accidents, that the unrestrained driver typically suffers catastrophic right-sided injuries comparable to those that Gilbert suffered, whereas the restrained passenger typically suffers only minor injuries comparable to those that defendant suffered." *Cf. id.* at 818 ("[I]t was not fanciful, arbitrary[,] or unreasonable for the trial court to allow the police [officers] to give causation testimony, based on their years of experience and real-world expertise as accident investigators.").

¶ 114     Granted, doctors are qualified to opine whether an injury is accident-related or preexisting. We agree with defendant when he says: "Illinois case law is replete with physicians who have testified, based on observation and experience, regarding their opinion of whether a

claimant was injured [as a result of the accident in question]." *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1073 (2007). Causation, however, was not even at issue in this case. The parties *stipulated* that Gilbert's fatal injuries were caused by the accident. Therefore, it was unnecessary for a physician to take the stand and opine, as medical experts traditionally have done, whether the injured person's condition resulted from the accident or, alternatively, preexisted the accident. See, *e.g.*, *id.*; *Ford v. Grizzle*, 398 Ill. App. 3d 639, 649 (2010). The stipulation took the issue of causation off the table. See *People v. Woods*, 214 Ill. 2d 455, 469 (2005).

¶ 115        Occupant placement was still on the table, but we are aware of no case holding that an experienced physician, simply by virtue of being an experienced physician, can determine occupant placement in a traffic accident. We are aware of no case holding that because a physician is qualified to opine whether an injury resulted from a traffic accident, a physician is qualified to opine whether the patient was the driver or the passenger. Therefore, we cannot say that, in granting the State's "Motion *in Limine* No. 2," the trial court "ignored recognized principles of law." *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000). And without being informed specifically how the education and experience of a physician specializing in internal medicine equips that physician to determine which of the two occupants of a wrecked vehicle was the driver, we cannot characterize the ruling as "arbitrary" or "unreasonable," either. (Internal quotation marks omitted.) *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Determining who, of two occupants, was the driver in an accident is different from determining whether an injury resulted from the accident. Thus, we find no abuse of discretion in the granting of the State's "Motion *in Limine* No. 2."

¶ 116        3. *The Alleged Violation of the Sixth and Fourteenth Amendments*

¶ 117 Defendant complains that by granting the State's "Motion *in Limine* No. 2," the trial court deprived him of his right under the sixth and fourteenth amendments (U.S. Const., amends. VI, XIV) to present testimony in his own defense.

¶ 118 We disagree that the trial court's ruling violated either of those constitutional amendments. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). "In the exercise of this right [to present witnesses in his own defense], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) is a reasonable rule of evidence. It is not arbitrary. By requiring that a witness be "qualified *** by knowledge, skill, experience, training, or education" to offer proposed expert testimony (Ill. R. Evid. 702 (eff. Jan. 1, 2011)), Rule 702 aims to "assure both fairness and reliability in the ascertainment of guilt and innocence" (*Chambers*, 410 U.S. at 302). Therefore, the sixth and fourteenth amendments do not exempt defendant from the requirements of Rule 702.

¶ 119 B. Allowing Shigemura To Rely on Injury Patterns
in His Determination of Occupant Placement

¶ 120 Defendant argues: "Shigemura *** does not possess the foundational medical skills that would allow him to determine what fatal injuries are, how injuries compare with one another, or comment about the relative severity of any injury and causation for certain injuries."

¶ 121　　　　　Actually, Shigemura did not have to determine that Gilbert had suffered fatal injuries in the crash. The parties stipulated to that fact. The parties stipulated that "the accident resulted in, and was the proximate cause of, Gilbert's death."

¶ 122　　　　　Surely, if Gilbert died of the injuries she sustained in the crash and if defendant, by contrast, was released from the hospital the next day, you would not need medical training to perceive that her injuries were more severe than his injuries.

¶ 123　　　　　Shigemura went on to opine that because Gilbert sustained more severe injuries than defendant, she must have been closer to the point of impact, *i.e.*, she must have been in the passenger seat rather than in the driver's seat. Defendant argues that, without medical training, Shigemura was unqualified to offer that opinion. He argues that an accident reconstructionist lacking medical training is unqualified to correlate occupant placement with the injury patterns documented in medical records.

¶ 124　　　　　Actually, Shigemura's testimony fell within the realm of physics, not medicine. He could have done essentially the same analysis if the two occupants of the pickup truck had been crash dummies in a simulated right-sided collision. He could have opined that crash dummy No. 2 must have been the passenger because it had severe damage on its right side, compared to crash dummy No. 1, which had little damage.

¶ 125　　　　　A traffic-accident reconstructionist has written:

"When damage occurs within a vehicle, this, along with occupant injuries, can often answer such questions as who was driving and whether occupants wore lap belts or shoulder harnesses.

The laws of physics assist the reconstructionist in examining the issue of 'who was driving.' When unrestrained drivers and passengers ride in a vehicle

- 34 -

that hits some object, the occupant kinematics often offer solutions to the perplexing dilemma of deciding who was driving and who was not.

A typical case has two people in a vehicle that runs off the road and into a tree. When the police arrive, there is one dead body in the car and one inebriated fellow sitting on the edge of the road. The vehicle belongs to the alcohol-influenced individual, and witnesses will state they last saw him driving away from the local watering hole. But chances are he will advise police that he and the decedent swapped places down the road and that he, the drunk, was asleep when the accident happened.

A careful examination of the vehicle, the location of damage, and the direction of force, plus the position of the deceased and the nature of the bodily injuries may confirm or rule out the possibility or probability that that person was driving. ***

*** [T]he reconstructionist may want to discuss occupant injuries with the pathologist, attending physician, or coroner. The location and nature of injuries to individuals can be matched with damage to vehicle interiors." Joseph E. Badger, *Reconstruction of Traffic Accidents, in* 9 Am. Jur. Proof of Facts 3d 115, § 15, at 153 (1990).

¶ 126     Note that, in this quoted passage, the traffic-accident reconstructionist is not the one who diagnoses the injuries. Rather, he or she obtains that diagnosis from physicians and other qualified medical personnel, as Shigemura did in the present case by reading the medical records.

¶ 127	It is true that Shigemura also looked at photographs of the occupants' injuries, but when doing that, he could just as well have been looking at photographs of the damage inflicted on inanimate objects that were in the cab of the truck at the time of the accident—such as crash dummies. In sum, we conclude that Shigemura stayed within the realm of accident reconstruction and out of the realm of medicine—or, more precisely, for purposes of our standard of review, the trial court reasonably concluded he did so—and thus, we find no abuse of discretion in the denial of defendant's motion *in limine*. See *People v. Williams*, 188 Ill. 2d 365, 369 (1999).

¶ 128	C. Proof, Beyond a Reasonable Doubt,
That Defendant Was the Driver

¶ 129	To find defendant guilty of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(d)(1)(F) (West 2012)), the jury had to find, among other elements, that he was driving the Ford F-150 pickup truck at the time of the accident. Defendant argues that, as a matter of law, the evidence in support of that element fails to satisfy the standard of proof beyond a reasonable doubt.

¶ 130	Defendant acknowledges that, on appeal, we should view all the trial evidence in the light most favorable to the prosecution and decide whether any rational trier of fact could find, beyond a reasonable doubt, that defendant was the driver. See *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). For essentially five reasons, he regards the evidence as unsatisfactory with respect to that element of the offense.

¶ 131	First, no eyewitness testified he was the driver, just as in *People v. Jefferson*, 1 Ill. App. 3d 484 (1971), and *People v. Ammons*, 103 Ill. App. 2d 441 (1968), no eyewitness testified that the defendants were the drivers—and in those cases, the appellate court reversed the

convictions of driving under the influence (*Jefferson*, 1 Ill. App. 3d at 486-87; *Ammons*, 103 Ill. App. 2d at 445). The facts in *Jefferson* and *Ammons*, however, are not the facts in the present case. *Jefferson* and *Ammons* are distinguishable if only because, in both of those cases, an eyewitness testified that he or she, rather than the defendant, actually was the driver at the time of the charged offenses. In *Jefferson*, Verna Malone testified that she, rather than the defendant, was driving the car when it skidded into a post. *Jefferson*, 1 Ill. App. 3d at 485. Similarly, in *Ammons*, a "witness named Wright" testified that he, rather than the defendant, executed the passing maneuver that prompted the traffic stop. *Ammons*, 103 Ill. App. 2d at 444. In the present case, by contrast, no eyewitness (other than defendant) testified to seeing who was in the driver's seat when the pickup truck left the parking lot of Thirsty's Tavern. True, by the same token, no eyewitness testified to seeing defendant driving—but as defendant admits, the identity of a driver can be proved by circumstantial evidence. See *People v. Lurz*, 379 Ill. App. 3d 958, 969 (2008).

¶ 132        Second, defendant argues that the testimony of his family members and the photographs in the record prove he was bruised from the passenger seatbelt, thereby corroborating his testimony that he was the passenger rather than the driver. The passenger seatbelt would have gone diagonally across defendant's torso, from the right shoulder to the left hip. Garry Hillis, Sr., never testified to seeing a diagonal bruise from defendant's right shoulder to his left hip. Instead, he testified to seeing a "yellowish bruise mark *** underneath his breast." Likewise, the photographs show no diagonal bruise but merely a faint area of redness under his left breast. (And, we might add, it is unclear how defendant, as a passenger, would have been bruised diagonally from the shoulder strap if, as Hall opined, the passenger would have been thrown to the right rear—seemingly away from the shoulder strap.) Lela Grove testified she saw a red mark on defendant's *right* side and extending down toward his hip. Arguably, a bruise in

that position would be more suggestive of a driver's seatbelt than a passenger's seatbelt. Ryan Baker testified to seeing "seatbelt marks," but he did not specify their location.

¶ 133          Third, defendant notes what Stewart told Weller: Gilbert drove to the Moto Mart the afternoon of the accident and tried to get some cash from the "debit machine." Even if Gilbert drove in the afternoon, however, it does not necessarily follow that she was the driver that evening. Also, we note a possible contradiction between her statement and defendant's testimony: Stewart told Weller that Gilbert was alone when she stopped by Moto Mart, whereas defendant testified he was with Gilbert.

¶ 134          Fourth, defendant argues that Hall's testimony corroborates his testimony that he was the passenger and Gilbert was the driver. But a reasonable trier of fact could have believed Shigemura over Hall. "It is for the trier of fact to evaluate the expert testimonies and weigh their relative worth in context. [Citation.] When the expert testimonies offer divergent conclusions, the jury is entitled to believe one expert over the other." (Internal quotation marks omitted.) *People v. Sims*, 374 Ill. App. 3d 231, 251 (2007). Defendant says: "The fact that James Hall's conclusion contradicted Nathan Shigemura's testimony tends to weaken Shigemura's opinion." Not necessarily. Insomuch as Hall's testimony contradicted Shigemura's testimony, the jury could have found Hall's testimony to be unconvincing: the jury could have decided that Shigemura was right and that Hall was mistaken. See *id.* After all, there is commonsensical appeal to the idea that, in a sideswiping collision on the passenger side, the occupant with the severe right-sided injuries and the extensive dicing lacerations was the passenger, as opposed to the occupant who suffered relatively minor injuries and fewer dicing lacerations. See *Parks v. Fuller*, 111 S.E.2d 755, 765 (Ga. Ct. App. 1959). Judging from the photographs admitted in evidence, the injuries that Gilbert sustained do not look like the type of injuries one would expect

to receive from being hurled into the soft body of a passenger. Rather, she looks as if she hit a utility pole with her right shoulder and the right side of her head. According to Shigemura's testimony, the passenger would have "engaged with" the utility pole, through the exploding window, as soon as the truck slid diagonally into the utility pole.

¶ 135 Fifth, defendant argues: "Additionally significant is the fact that Brandy Gilbert owned the vehicle." Citing *People v. Kizer*, 365 Ill. App. 3d 949, 962 (2006), he notes: "It has been recognized in DUI cases that when the identity of the driver is unknown, the jury may infer that the owner of the vehicle was driving." Actually, it appears that defendant was the registered owner of the Ford F-150 truck, the truck involved in the accident. People's exhibit No. 45 is a photograph of a 2013 Illinois registration identification card found in the truck, and the registration card has defendant's name on it. The license-plate number on the registration card, 1138851, matches the license-plate number on the truck, as shown in People's exhibit No. 7. Defendant even testified he was the registered owner. It would be possible for a rational trier of fact to find that defendant was the owner of the F-150 truck. And to quote defendant's own argument, such a trier of fact "may infer that the owner of the vehicle was driving."

¶ 136 To be sure, defendant testified that Gilbert, rather than he, was the driver; but the jury did not have to believe him. "[I]t is not our role to reweigh the evidence received by the jury, but rather to determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *People v. Purdle*, 212 Ill. App. 3d 594, 597 (1991). A rational jury could have found, beyond a reasonable doubt, that defendant was the driver.

¶ 137 III. CONCLUSION

¶ 138 For the foregoing reasons, we affirm the trial court's judgment. We assess $75 in costs against defendant.

¶ 139        Affirmed.