NOTICE

Decision filed 12/07/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210075-U

NO. 5-21-0075

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Johnson County. |
| | ) | |
| v. | ) | No. 18-CF-71 |
| | ) | |
| CYLE W. HARNER, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State presented sufficient evidence to prove beyond a reasonable doubt that the defendant was driving his vehicle at the time of the accident, and that he was guilty of aggravated driving under the influence of alcohol resulting in the death of one passenger and permanent injuries to another passenger.

¶ 2    Following a bench trial, the defendant, Cyle W. Harner, was found guilty of reckless homicide, a Class 3 felony (720 ILCS 5/9-3(a) (West 2018)), aggravated driving under the influence resulting in death, a Class 2 felony (625 ILCS 5/11-501(d)(1)(F) (West 2018)), and aggravated driving under the influence resulting in great bodily harm and permanent disability, a Class 4 felony (625 ILCS 5/11-501(d)(1)(C) (West 2018)). Prior to sentencing,

1

the trial court vacated the guilty verdict as to reckless homicide under the one act, one crime rule. The defendant was sentenced to three years in prison on the Class 2 felony and two years in prison on the Class 4 felony,[1] and the sentences were to run concurrently. The court also imposed a $1500 fine. On appeal, the defendant contends that the judgment should be reversed, and the convictions and sentences set aside, because the State failed to prove beyond a reasonable doubt that he was driving the vehicle at the time of the accident. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On March 22, 2018, at approximately 2 a.m., the defendant's 2008 Ford F-350 truck was involved in a single-vehicle accident on Old Route 146 Loop, near Honeysuckle Lane, in Johnson County, Illinois. The truck left the roadway and struck a line of trees. Troy Newman, Tyler Inman, and the defendant were all ejected from the vehicle. Troy Newman was transported by ambulance to the Heartland Regional Medical Center in Marion, Illinois, where he was pronounced dead. The cause of death was closed chest and abdominal injuries secondary to a motor vehicle crash with ejection. Tyler Inman was also transported to a hospital in Marion, and then airlifted to St. Louis University Hospital. He sustained serious injuries requiring several surgeries, and some permanent impairment. The defendant was airlifted to Deaconess Hospital in Evansville, Indiana. He also sustained serious injuries requiring an extended hospital stay. The Illinois State Police Traffic Crash Scene Reconstruction Unit investigated the crash.

---

[1]The trial court subsequently found that the defendant was eligible for a possible placement in the impact incarceration program (730 ILCS 5/5-8-1.1 (West 2020)).

2

¶ 5     On December 26, 2018, the defendant was charged with reckless homicide (count I), aggravated driving under the influence resulting result in the death of Troy Newman (count II), and aggravated driving under the influence resulting in the serious and permanent injury to Tyler Inman (count III). The defendant waived his right to a jury trial. The bench trial began on November 16, 2020. Determining who was driving the vehicle at the time of the crash was the primary factual issue in dispute. A summary of the evidence follows.

¶ 6                              A. The Crash

¶ 7     On the evening of Wednesday, March 21, 2018, Tyler Inman, Troy Newman,[2] and the defendant were at Big Boys Bar and Grill (Big Boys) in Vienna, Illinois. Big Boys, along with a few neighboring taverns, hosted a Wednesday night pool league. Tyler played with his team at Big Boys. Troy played at a neighboring tavern and met up with Tyler at Big Boys later that evening. Tyler and Troy were close friends. Troy planned to drive Tyler home that evening.

¶ 8     Darlene Harner, her daughter Diana, and Breeanna Adams (Bree) were working at Big Boys that night. It was the final night of competition for the pool league and there was a full turnout. Bree tended bar that night. She testified that Tyler was drinking beer and "Vegas bombs." The defendant was drinking beer, but he may have had some Vegas bombs toward the end of the night. Bree explained that a "Vegas bomb" is made by mixing

---

[2]During the trial, some witnesses referred to Troy Newman and Tyler Inman by their first names, and other witnesses referred to them by their last names. For clarity, we will refer to Troy Newman and Tyler Inman by their first names in this order.

Jägermeister with an energy drink. Troy was drinking soda that evening. Darlene Harner testified that Troy stated that he would drive Tyler and the defendant home that night. Darlene noted that Troy did not consume alcohol and often acted as Tyler's designated driver.

¶ 9     Darlene testified that Big Boys closed at 2 a.m. on March 22, 2018. A few minutes before closing time, Darlene went into the kitchen to turn off the lights and the fans. Troy, Tyler, and the defendant were still seated at the bar. While Darlene was in the kitchen, she heard a truck start up and a "revving" sound. Then, she heard the truck go "like a bat out of hell." Darlene stepped outside and saw Tyler's truck in the parking lot. When Darlene went back inside, she told her daughter that "the boys" would be back soon because they left cigarettes, pool cues, coats, and a cell phone on the bar. A few minutes later, Darlene noticed a police car traveling westbound at a high rate of speed. She then saw another police car, with lights flashing, and an ambulance, both heading westbound.

¶ 10    Shortly after 2 a.m. on March 22, 2018, Fred Hudson and his wife were awakened by a loud noise. Hudson's home was on the north side of the Old Route 146 Loop, near Honeysuckle Lane. Fred Hudson testified that he heard a roaring sound followed by a screeching sound and a thump. He dressed and drove down the driveway. The headlights of his car reflected on a truck that had apparently crashed. Hudson exited his car and heard someone "hollering for help." He called 9-1-1. While waiting for the police, Hudson noticed a motor, still steaming, lying in the roadway. He then saw Tyler. Tyler appeared to be in a lot of pain. When Hudson approached, Tyler asked whether someone was coming to help. Tyler also asked, "Who the f*** was driving?" Hudson then observed Troy on the

4

ground about five feet down and to the right of Tyler. Tyler and Troy were both on the passenger side of the cab. When Hudson walked around to the driver's side of the cab, he observed the defendant lying up against a tree. The bed of the truck was 40 to 50 feet west of the cab.

¶ 11    Johnson County Sheriff's Deputies Scott Sparks and Dustin Sheffer responded to the accident scene. Two ambulance crews arrived a few minutes later. Deputy Sparks noticed a large amount of debris strewn around the roadway. He observed an engine, with steam coming from it, located in the eastbound lane of Old Route 146, and the cab of the truck near the tree line. Sparks approached the defendant and asked his name. The defendant identified himself as Cyle Harner. Sparks recognized that the defendant had worked as a deputy in the Johnson County Sheriff's Department, and that the defendant's father, Charles Harner, was the Sheriff of Johnson County. Sparks asked the dispatcher to notify Sheriff Harner and the Illinois State Police of the crash. Pursuant to the request of the Illinois State Police, Sparks drew a diagram of the accident scene, indicating the locations of the ejected occupants and some parts of the vehicle.

¶ 12    Deputy Dustin Sheffer checked on Troy and Tyler. Both were found on the right side of the cab. Troy was nonresponsive. Tyler appeared to be in pain and did not say anything to Sheffer about the accident. Scheffer recalled that Tyler's cell phone rang. Sheffer picked up the phone and answered it. The caller identified herself as Jessica Wright. She was Tyler's girlfriend. Sheffer directed Jessica to the location of the accident and returned the phone to Tyler.

¶ 13    Jessica Wright testified that Tyler called her from the scene. Tyler told Jessica that he had been in a wreck at "the four-way" in Vienna, but he did not say who was driving. Jessica drove to "the four-way," but did not find Tyler there. She called Tyler's cell phone and spoke with a police officer who directed her to the scene. When Jessica arrived at the scene, she did not speak with Tyler because he had already been placed in an ambulance. Later that morning, Jessica saw Tyler in the emergency room at St. Louis University Hospital. Tyler was in a lot of pain. He did not tell her who was driving the truck when it crashed.

¶ 14    Sheriff Charles Harner[3] arrived at the scene of the accident and went over to check on the defendant. Harner testified that the defendant was agitated and in pain. The defendant was complaining that no one was helping him, and he was in a "cussing fit." Harner told the defendant that he had to help himself and calm down. In response, the defendant said, "I'm sorry." Harner interpreted the defendant's statement to be an apology for acting out. Harner did not think the defendant meant that he was sorry for causing the crash.

¶ 15    Harner immediately turned the investigation over to the Illinois State Police. He saw the defendant at the hospital the next day. The defendant had several broken ribs, a spinal fracture, a broken arm and elbow, and torn ligaments in his knee. The defendant was placed in an induced coma for 21 days. Harner stated that the defendant had no recollection of the crash when he came out of the coma.

---

[3]At the time of the trial, Charles Harner was no longer the sheriff of Johnson County.

¶ 16    Harner testified that the defendant had been employed as a patrol deputy from 2012 to 2015, and a canine officer from 2015 to 2018. In January 2018, the defendant began working for a private security contractor in Virginia, and he received advanced training in canine bomb detection. He had been scheduled to report to the United States Embassy in Bagdad, Iraq, to provide security services, but his injuries prevented him from doing so. Harner recalled that the defendant spent about $7000 on the motor of the truck before he left for Virginia. The truck had blown an injector and was losing oil, so it needed to be repaired. Harner stated that the defendant was proud of his truck. When asked whether the defendant would want "people at the bars and stuff like that" to drive the truck, Harner replied, "As far as I know, no."

¶ 17                    B. The Crash Investigation

¶ 18    Chad Brown, an Illinois State Police officer, was the case agent for the investigation. Brown had been employed with the Illinois State Police for 24 years. As a case agent, Brown collected all reports and interviews from the investigation. He also conducted interviews and followed up on investigative leads.

¶ 19    Brown testified that a search warrant was issued to obtain the defendant's hospital records, including the results of a blood draw. The records indicated that the defendant's blood was drawn at 5:13 a.m. on March 22, 2018. The defendant's blood alcohol serum was 220 milligrams per deciliter. The court took judicial notice that the serum level converted to a blood alcohol level of 0.186. Investigators also obtained Tyler's hospital records. The records indicate that Tyler's blood was drawn at 6:11 a.m. on March 22, 2018.

7

Tyler's blood serum was 95. This converted to a blood alcohol level slightly over the legal limit of 0.08.

¶ 20    Brown stated that two officers interviewed Tyler while he was in the surgical recovery unit at St. Louis University Hospital. The interview occurred on March 22, 2018, about 10 hours after the accident, and it was videotaped. The prosecutor then asked Brown whether Tyler had identified the driver of the truck during that interview. The defense objected on hearsay grounds, and the objection was sustained. Brown testified that he interviewed Tyler on May 14, 2018, and that interview was also videotaped. Brown also interviewed the defendant at the Vienna Police Department about one month after the accident. During that interview, the defendant stated that he had no memory of the crash.

¶ 21    During cross-examination, Brown testified that he obtained a surveillance video taken inside Big Boys on the night of the crash. When Brown stated that he could not recall if he had viewed the video, defense counsel played the video to see if it would refresh Brown's recollection. In particular, Brown was asked to review the frames where Troy, Tyler, and the defendant were leaving the bar. Defendant's counsel asked whether it appeared that "one person is handing something to someone else?" Brown replied that it looked like "he did something with his right hand." When asked whether it appeared that "the defendant was handing somebody something with his right hand," Brown replied, "Could have been." Brown was also shown a still photo made from the video. Brown was asked whether it appeared the defendant was handing something to "the person that's wearing the hat with the sunglasses on the brim." Brown said that the photo was not clear enough to be able to say for sure what they were doing. On redirect, Brown was shown the

8

surveillance video again. When asked whether he could tell what the defendant was doing, Brown replied, "I don't know if [the defendant] is tapping him on the chest or what."

¶ 22   Defense counsel also asked several questions about Brown's interview with Tyler. Brown testified that Tyler did not remember leaving the bar. Tyler could not recall how he got into the vehicle, but he did say that he got in on the passenger side. Tyler did not remember the defendant starting the truck. Tyler had no memory of anything else until seconds before impact. Brown recalled that Tyler described how he put his hands up to brace for impact. Tyler stated that as he braced himself, he looked across and saw the defendant driving. Brown testified that he questioned Tyler about which way the truck was sliding, but did not recall Tyler's response. At that point, defense counsel played the video recording of Brown's interview with Tyler. Defense counsel also presented Brown with an exhibit containing a transcript of the question and answer. After reviewing these exhibits, Brown testified that Tyler thought the defendant was in the front of the slide and that the driver's side was toward the road.

¶ 23   Tyler testified that he went to Big Boys after work at 4 p.m. on March 21, 2018. He was scheduled to play in the Wednesday night pool league. Tyler admitted that he drank seven or eight beers and two or three Vegas bombs over the course of the evening. Tyler testified that Troy was going to drive him home. Tyler recalled that the defendant had beer and Vegas bombs. Tyler said that the defendant talked about his truck. The defendant indicated that he put a high-performance kit in his truck, but he did not talk about racing it.

¶ 24   Tyler testified that he remembered going to the parking lot with Troy and the defendant at closing time, but he could not recall why they all went out there. Tyler stated

that he was 100% sure that the defendant was driving. Tyler remembered that he was in the front passenger seat and that Troy was in the back seat. Tyler also remembered that the defendant "went wide," hit loose gravel, and lost control of the truck. When the truck started to slide, Tyler raised his right arm toward the handle near the passenger's window and braced his legs for impact. The truck went sideways and hit the trees. Tyler acknowledged that he was intoxicated that evening.

¶ 25    Tyler testified that he was in a surgical recovery unit when he was first interviewed by police officers. Tyler vaguely remembered the interview and was not able to relate much about the crash at that time. Tyler stated that he was interviewed by Officer Chad Brown a few weeks after he was discharged from the hospital. During the interview, he told Brown that the defendant was driving. Tyler testified that he clearly remembered looking across to the driver's side and seeing the defendant driving.

¶ 26    Tyler stated that he sustained severe injuries to his right arm and had a reconstructed right elbow. He also had a hole in his lung, broken ribs, and severe injuries to his left leg. Tyler testified that he had over 15 surgeries in the 2½ years since the crash. He did not have full motion in his right arm and had difficulty walking due to the leg injuries.

¶ 27    During cross-examination, Tyler testified that he did not recall seeing the defendant hand his car key to Troy before they left Big Boys. Defense counsel showed Tyler a still photo made from the surveillance video, and asked whether it appeared that the defendant was handing something to Troy. Tyler stated that he did not see any keys, and that, if anything, it looked like the defendant was giving Troy a "knuckle bump." Tyler agreed that

10

the defendant's hand appeared to be closed, and it "could be possible" that the defendant was handing his key to Troy.

¶ 28    Tyler testified that he did not recall anything about the first interview with the police. He had no recollection of speaking with anyone, including his mother, before he was interviewed by the police. Defense counsel then played the videotape of the first interview with the police. The video did not refresh Tyler's recollection of the interview. Tyler agreed that the video showed that he told the officers that he got into the truck on the passenger side and that the defendant was driving the vehicle. Tyler was also asked about a deposition he had given in a personal injury suit that he filed against the defendant and Big Boys. Tyler acknowledged that during the deposition he testified that the defendant got in the driver's seat, that he got into the front passenger seat, and that Troy got into the back seat. Tyler explained that while he did not have a specific memory of getting into the truck, he did remember where everyone was seated. Tyler testified that he did not remember asking Fred Hudson, "Who the F was driving," at the accident scene.

¶ 29    Illinois State Trooper Matthew Deschamps was dispatched to the scene between 6 a.m. and 7 a.m. on the morning of March 22, 2018. On that date, Deschamps was assigned to the crime scene unit. Deschamps testified that when he arrived, he observed debris on the north and south sides of the Old Route 146 Loop. The debris field was over 150 feet in length. Deschamps observed scrapings and scratches on the trees in close proximity to the vehicle parts. Deschamps examined the cab. He observed that the front passenger door was in an open position, and the back window was completely broken. The driver's and

11

passenger's air bags had deployed and were deflated. The seat belts were in a retracted and locked position. Deschamps took dozens of photographs to document his observations.

¶ 30    Deschamps also collected several items of physical evidence from the scene. He removed the front passenger and driver air bags, and the front seat covers from the cab of the vehicle. He swabbed the key in the ignition, the steering wheel, and the shifter for DNA. He did not fingerprint the key in the ignition or the driver's door handle. Deschamps photographed a pair of red sunglasses in front of the driver's seat sticking out of the front windshield glass. He stated that the sunglasses could be an important piece of evidence if there was proof that the sunglasses originated from the driver's area. Deschamps took swabs of red blood-like substances found in an area west of the cab and another area near the rear passenger area. He collected two cowboy boots and the defendant's identification card found near the defendant. He also collected the review mirror that had been found near the defendant, and he recovered a partial print from the mirror.

¶ 31    The State stipulated that the only items submitted to the Illinois State Police Forensic Lab for analysis were the passenger's air bag, the driver's air bag, and the buccal swabs taken from Troy, Tyler, and the defendant. Eric Corey performed the analysis of that evidence. Corey testified that he examined the passenger side air bag for blood and found none. He swabbed the middle of the passenger side air bag to collect any skin cells or other cells that might be present. Corey compared the DNA from the buccal swabs with the DNA from the material on the passenger air bag. Corey testified to a reasonable degree of scientific certainty that Tyler Inman's DNA was on the passenger side air bag. Corey stated that the match indicated that Tyler contacted the passenger side air bag. Corey did not find

the defendant's DNA or Troy's DNA on the passenger air bag. Corey also tested the driver's side air bag. He found a mixture of DNA profiles, but the results were inconclusive as to who contributed to those profiles. During cross-examination, Corey acknowledged that he swabbed only the middle of the passenger air bag.

¶ 32                    C. The State's Accident Reconstruction Testimony

¶ 33    Sergeant Brad Brachear testified that he was a member the Illinois State Police Traffic Crash Reconstruction Unit. He began working as a crash reconstruction officer in 2015. Brachear testified that he had been the lead reconstructionist on approximately 175 cases, and had been "on scene" for over 200 cases. Of those 175 cases where he acted as lead reconstructionist, 30 involved single-vehicle crashes with vehicle rotation. Brachear prepared an accident reconstruction report for this incident, and it was admitted into evidence.

¶ 34    In his report, Brachear noted the weather and road conditions at the time of the collision. The temperature was 31 degrees, the roadway was dry, and the winds were calm. The road was asphalt and "traffic polished." The east and westbound lanes of Old Route 146 were separated by two solid yellow lines, and the outer edge of each lane was marked by a fog line. This was a rural area, and the speed limit was 55 miles per hour.

¶ 35    Brachear testified that he arrived at the scene about three hours after the crash. After receiving a briefing, Brachear inspected the scene, noting the tire marks in the roadway, the furrows and tire marks in the grass southwest of the roadway, and damage to a line of trees south of the roadway. Brachear was informed that the defendant was found east of the truck's cab, along the tree line. The defendant was between the area where the truck

13

struck the trees and where the cab came to rest. Brachear observed a small pool of blood in that area, along with the defendant's identification card. The truck's rearview mirror was just east of the identification card. He observed a small pool of blood, west of the cab, in the area where Tyler came to rest. Troy was found just south of Tyler. Brachear also inspected the cab of the vehicle. He found that the seatbelts were retracted and locked, and that the front air bags had deployed. The steering wheel, accelerator, and brake pedals had been damaged. He noted that the headlight switch was in the "on" position, and that the center console was extended up, creating a third seat in the front.

¶ 36    Brachear testified that he used a "Leica Total Station" to map the crash scene. An "Unmanned Aerial System" was deployed to take aerial photographs of the scene and debris field. In all, 172 photographs were taken. Brachear then described the crash as he had reconstructed it. The defendant's vehicle was traveling west on Old U.S. Route 146 Loop at Honeysuckle Lane. The driver failed to negotiate a slight left-handed curve in the road, causing the tires on the right side of the truck to leave the roadway to the right. The driver attempted to return the vehicle to the road, but he oversteered, causing "a critical speed yaw." The vehicle began to rotate counterclockwise. It traveled across both lanes of traffic and left the roadway to the south. Brachear testified that the vehicle's speed was approximately 87 miles per hour. He used the measurements of the tire marks, the slope, grade, and condition of the roadway, and the drag factor to calculate speed.

¶ 37    Brachear testified that the vehicle continued to rotate counterclockwise through the grass and into a tree line south of the roadway. The cab had rotated just beyond 90 degrees, and was perpendicular to the tree line, when it struck the first tree. The vehicle hit the next

two trees in rapid succession. The vehicle struck the second tree just in front of the right wheel, and the right wheel hit the third tree. The cab separated from the chassis and became airborne. At that point, it was difficult to determine how many times the cab rotated before it came to rest. When the cab came to rest, it faced the tree line and was perpendicular to the road. The engine came to rest in the eastbound lane of the roadway. The bed and frame remained intact and rested along the tree line, west of the cab.

¶ 38    Brachear testified that the primary collision occurred when the vehicle struck the first tree. That impact could have caused the air bags to deploy. The front passenger door was compromised when the truck struck the trees, and all three occupants were ejected through that door. Brachear stated that the location of the rearview mirror was a significant piece of information in assessing who was driving the vehicle. He explained that when the truck struck the tree and went airborne, all three occupants traveled forward and to the right inside the cab. He opined, based upon the dynamics of the crash, that the driver was the only occupant that likely would have come into contact with the rearview mirror. Brachear testified that the rearview mirror would not have come off without some force acting upon it. Brachear noted that the rearview mirror was found in the tree line, southeast of the cab, near where the defendant was located after the crash. Brachear testified that the injuries to Tyler's right arm and shoulder were consistent with him striking the passenger door, and having the weight of the other occupants pushing against him as they slid to the right. Brachear stated that the location of the final resting place of the occupants, the location of the rearview mirror in relation to the defendant's final resting position, and the DNA results

15

on the passenger side air bag all correlated with Tyler's statement that the defendant was driving the truck at the time of the collision.

¶ 39    Based upon his analysis of the physical evidence, Brachear opined to a reasonable degree of scientific certainty that the defendant was driving the Ford F-360 truck at the time of the accident. Brachear further opined that Tyler was in the front passenger seat, and that Troy was in the front center seat. Brachear also testified to a reasonable degree of certainty that the primary causes of the crash were driving too fast for conditions and driving under the influence of alcohol.

¶ 40         D. Defendant's Reconstruction Expert and Character Witnesses

¶ 41    The defendant called Bruce Enz as his reconstruction expert. Enz testified that during his 45-year career, he reconstructed almost 8000 crashes, of which 1500 were single-vehicle crashes. Enz reviewed the photos, measurements, and reports from the Illinois State Police. He visited the scene to take additional measurements on April 16, 2020. Enz noted that the vehicle was not available for inspection because it had been scrapped a couple of months after the accident. He prepared a reconstruction report that was admitted into evidence.

¶ 42    Enz testified that the Ford F-350 was westbound on Old Route 146. As it passed Honeysuckle Lane, the tires on the right side of the truck left the roadway and went onto the grass. As the driver corrected, the vehicle went into a yaw counterclockwise. The weight of the vehicle shifted to the right and it continued to rotate. The vehicle crossed the roadway and continued down the shoulder slope to a line of trees. The front of the vehicle was pointed in a southerly direction when the front bumper and hood contacted the first

16

tree. Enz described this as "somewhat of a sideswipe impact," but it was sufficient to deploy the air bags. Because the occupants were not wearing their seat belts, their arms and torsos would have been flailing forward. Enz indicated that the rearview mirror was likely detached with the first impact. As the truck continued its counterclockwise rotation, the right side of the right front wheel and quarter panel struck the second tree in the tree line. During the second impact, the front axle separated from the frame and the right front door flew open. Enz indicated that the right front seat occupant would have been ejected to the west of the tree line. Enz noted that the defendant was the only occupant found near the tree line and east of the cab. As the front end of the vehicle rotated toward the north, the chassis and bed separated from the cab and came to rest against a tree west of the cab. The vehicle continued to rotate counterclockwise, and the left rear of the vehicle struck the embankment. The right front door of the cab was beginning to face the roadway when the cab struck the ground. Because of the deceleration, at least one of the occupants was ejected. When the occupant hit the ground, his blood spattered near the edge of the roadway. This was where Tyler was found. Then, as the cab came to rest, the remaining occupant would have been ejected. Troy was found just south and west of Tyler.

¶ 43    Based upon the physical evidence, the location of ejected occupants, and the crash dynamics, Enz opined that the defendant could not have been the driver of the vehicle. Enz reasoned that there was only one time during the crash event when the right side of the cab was pointed toward the tree line. If the defendant had been the driver, and therefore the third occupant ejected from the vehicle, then all three occupants would have been found near or along the tree line. Enz stated that evidence showed that the defendant was the only

17

occupant found near the tree line, east of the cab. Troy and Tyler were found west of the cab. Enz concluded that the defendant was seated in the front passenger seat and ejected first. Enz testified that Tyler's DNA could have been on the front passenger air bag if he had been seated in the middle seat because Tyler would have been sliding to the right and the defendant would have been pushed against the door. Enz did not offer an explanation as to why Tyler had severe injuries to his right arm, and the defendant did not.

¶ 44   In his testimony and his report, Enz was somewhat critical of the police for failing to preserve evidence, including the truck itself, and failing to fingerprint the key and driver's side door handle. But Enz credited them with taking a tremendous number of photographs that documented the scene of the crash. Enz testified that he had sufficient physical evidence and information to reconstruct the accident and to determine the approximate speed of the truck, its basic movements, and the order of ejection of the occupants.

¶ 45   The defense also offered testimony from character witnesses. In a written statement, Ricci Ostermeyer noted that he had worked with the defendant at the month-long training in canine bomb detection. Ostermeyer opined that the defendant was levelheaded and extremely careful. Ostermeyer had not known the defendant to drive after he had been drinking. Zachary Moore and the defendant grew up together. Moore testified that the defendant was levelheaded and had never put anyone's well-being in jeopardy. Moore stated that the defendant was respectful of the law. Moore did not believe the defendant would drive while intoxicated. During earlier testimony, Darlene Harner stated that the defendant had a wonderful reputation in the community.

18

¶ 46    At the close of the evidence, the trial court took the matter under advisement. On November 19, 2021, the court issued its verdict. The court found that the defendant was guilty of reckless homicide, aggravated driving under the influence resulting in the death of Troy Newman, and aggravated driving under the influence resulting in permanent injury to Tyler Inman. The court later vacated the guilty verdict on reckless homicide under the one act, one crime rule.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, the defendant contends that the State failed to prove he was guilty of felony aggravated driving under the influence of alcohol beyond a reasonable doubt. The defendant argues that the totality of the evidence demonstrates that he was not, and could not have been, the driver of the vehicle at the time of the accident, and thus, there was a reasonable doubt as to an essential element of the charged offenses.

¶ 49    When considering a challenge to the sufficiency of the evidence, the reviewing court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). When conducting this inquiry, it is not the role of a reviewing court to retry the defendant. *Cunningham*, 212 Ill. 2d at 279. The reviewing court must carefully examine the record, keeping in mind that it was the trier of fact who saw and heard the witnesses. *Cunningham*, 212 Ill. 2d at 280. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the credibility of the witnesses, the weight of the evidence, and the reasonable inferences to be

19

drawn from the evidence. *People v. Jophlin*, 2018 IL App (4th) 150802, ¶ 38. Testimony may be found insufficient only where it is clear from the record that no reasonable person could find it credible beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280. A reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt about the defendant's guilt. *Jophlin*, 2018 IL App (4th) 150802, ¶ 38.

¶ 50    A person commits the offense of aggravated DUI, a Class 2 felony, when he drives or is in actual physical control of a vehicle while under the influence of alcohol and is involved in a motor vehicle accident that results in the death of another person, and the act of driving the vehicle under the influence of alcohol is a proximate cause of the death. 625 ILCS 5/11-501(d)(1)(F) (West 2018). A person commits the offense of aggravated DUI, a Class 4 felony, when he drives or is in actual physical control of a vehicle while under the influence of alcohol and is involved in a motor vehicle accident that results in the great bodily harm or permanent disability or disfigurement to another person, and the act of driving the vehicle under the influence of alcohol is a proximate cause of the injury. 625 ILCS 5/11-501(d)(1)(C) (West 2018).

¶ 51    In this case, the primary question before the trial court, sitting as the trier of fact, was which of the occupants was driving the vehicle at the time of the crash. The defendant contends that the State failed to prove beyond a reasonable doubt that he was driving the vehicle at the time of the accident. Initially, the defendant argues that no reasonable fact finder could have reasonably found his expert's testimony unworthy of belief. The defendant claims that his expert was more experienced than the State's expert. The

20

defendant also claims that his expert provided the basis for his opinion that the defendant could not have been the driver. The defendant asserts that the State's expert never explained how the ejected occupants could have arrived at the locations where they were found if the defendant had been the driver. The defendant concludes that his expert's opinion, standing alone, created reasonable doubt that the defendant was the driver.

¶ 52    It is the function of the trier of fact to evaluate the testimony of the experts and to weigh the relative worth of their opinions in context. *People v. Hillis*, 2016 IL App (4th) 150703, ¶ 134. When experts offer different opinions and conclusions, the fact finder is entitled to believe one expert over the other. *Hillis*, 2016 IL App (4th) 150703, ¶ 134. Here, before announcing the verdict, the trial court stated that it considered the qualifications and experience of the witnesses. The court also stated that it judged the credibility of the witnesses and the weight to be given to the testimony of each witness. A review of the trial transcript shows that the testimony of the experts as to the dynamics of the accident and the movement of the vehicle were not all that different. Although the experts reached different conclusions regarding the calculated speed of the vehicle, they agreed that the vehicle was traveling well over the speed limit when it failed to negotiate the curve on the roadway and began to slide. The trial court, as the finder of fact, could have reasonably determined that Sergeant Brachear's opinion that the defendant was the driver was supported by other evidence, including the evidence of Tyler's DNA on the passenger air bag, the nature and location of Tyler's injuries, Tyler's statements regarding who was driving the vehicle, and the evidence that the rearview mirror was found near the defendant. In addition, the court may have considered the evidence that the defendant was somewhat

21

possessive of his vehicle and ordinarily would not want others to drive it. Upon considering the conflicting opinions of the experts in the context of the other evidence, the trier of fact could have reasonably concluded that the defense expert's testimony was unconvincing. After carefully considering the record, we do not find that that the opinions of the defendant's expert, standing alone, created reasonable doubt that the defendant was the driver.

¶ 53   The defendant also argues that Tyler's testimony was not credible. He claims that Tyler was not a disinterested witness because his close friend was killed in the crash. He claims Tyler was biased because Tyler had filed a civil suit against the defendant and had a financial interest in the outcome. The defendant further claims that Tyler's memory was spotty, and that his testimony was inconsistent with known or probable facts.

¶ 54   In this case, the trial court had an opportunity to observe Tyler's memory, his demeanor, and his credibility as he testified. The record demonstrates that Tyler was vigorously cross-examined by defense counsel. Tyler admitted that he had an incomplete memory of the events on the night of the crash. Tyler testified that he remembered that he was in the passenger seat, and that when he began to brace himself for the impact, he looked across and saw that the defendant was driving the truck. The trial court also had the opportunity to view both of Tyler's videotaped interviews with investigators, and to consider any inconsistencies between Tyler's trial testimony and his recorded statements. Those video recordings were not offered into evidence and are not in the record on appeal. The State offered circumstantial and scientific evidence that supported Tyler's testimony. Here, the trial court was in a superior position to judge the credibility of Tyler's testimony.

The trial court may have reasonably found that Tyler's testimony was credible, and we will not disturb that determination on appeal. *Jophlin*, 2018 IL App (4th) 150802, ¶ 38.

¶ 55 The defendant also argues that the evidence of the defendant's good character and respect for the law provided additional proof of reasonable doubt. As the State points out, the defendant's blood alcohol level was more than twice the legal limit on the night of the crash. Thus, the trial court, as the trier of fact, may have reasonably found that the defendant did not exercise reasonable judgment that night, and that he drove recklessly. The court may have reasonably concluded that the defendant's aunt and the defendant's lifelong friend were biased and that their testimony was entitled to little weight. The court may also have assigned little weight to the testimony of the defendant's other character witness, Ricci Ostermeyer, as he had known the defendant for only one month.

¶ 56 Finally, the defendant claims that a negative inference should have been drawn from the failure of the police to preserve the truck and to test specific items of evidence. The defendant asks this court to draw the negative inference, and thereby strengthen the evidence of reasonable doubt. Throughout the trial, and during closing argument, the defendant pointed to errors by the police, including the failure to preserve the truck, to test ignition key and the driver's door for fingerprints, and to analyze blood samples collected at the scene. The defendant argued that the investigation was flawed as a result of the missing evidence. It is noteworthy that the defendant's own expert testified that the missing evidence did not impede his reconstruction of the accident. In delivering the verdict, the trial court stated that it considered all of the evidence, exhibits, and stipulations. It is the

23

role of the fact finder to weigh the evidence and draw reasonable inferences therefrom, and we will not substitute our judgment for that of the fact finder on those matters.

¶ 57                                    III. CONCLUSION

¶ 58    In this case, the trial court considered the testimony and determined that the State presented sufficient evidence to demonstrate beyond a reasonable doubt that the defendant was driving the vehicle at the time of the crash. The trial court, as fact finder, considered the credibility of the witnesses and the weight to be given the testimony. As a reviewing court, we do not reweigh the evidence, but rather determine whether any rational trier of fact could have found the elements of the crimes beyond a reasonable doubt. After carefully reviewing the record, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the defendant was driving the vehicle at the time of the crash, and that he was guilty of aggravated driving under influence of alcohol resulting in the death of Troy Newman and permanent injuries to Tyler Inman.

¶ 59    Accordingly, the judgment of the trial court is affirmed.


¶ 60    Affirmed.